Filed 12/31/25  P. v. Coleman CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B343177 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA347333) |
| v. | |
| RANDELL COLEMAN, | |
| Defendant and Appellant. | |

THE COURT:

Defendant and appellant Randell Coleman (defendant) appeals from the denial of his second petition for vacatur of his murder conviction and resentencing under Penal Code[1] section 1172.6.  Defendant contends his "counsel failed to arise and introduce to this court's [*sic*] . . . evidence[] that leads to his innocence."  Defendant's appointed counsel identified no arguable

---

[1]      All further unattributed code sections are to the Penal Code unless otherwise stated.

issues and filed a brief requesting we exercise our discretion to conduct an independent review of the record as set forth in *People v. Delgadillo* (2022) 14 Cal.5th 216 (*Delgadillo*).  We have considered defendant's supplemental brief and reviewed the record.  Finding no merit to defendant's appeal, we affirm the judgment.

## BACKGROUND

**Factual background**[2]

### *Prosecution evidence*

On August 25, 2008, three automobiles, including a blue Jeep Cherokee, entered the residential neighborhood of West 70th and Main Streets at 5:30 p.m.  The cars made a U-turn one after the other and came to a stop on 70th Street, near approximately 20 people who were outside. Included among them were D. Smith, her friend Cassandra Rankins (Rankins), Grisby, who had been walking in the neighborhood pushing his six-year-old brother Moore in a toy car, and L. Smith, Grisby's stepfather, who had been working on his car.  Defendant emerged from one of the vehicles holding an M-11 semiautomatic rifle.  Defendant looked around as though searching for someone, before he pointed the gun, holding it in both hands.  D. Smith, Rankins, Grisby, Moore and others ran for cover.  As she ran, D. Smith heard more than 20 gunshots fired in rapid succession.  Rankins heard about 40 shots.

When the shooting ceased and the cars left the scene, D. Smith, Grisby, and Moore each had a bullet wound and

---

[2]     The factual background is taken directly from our opinion affirming defendant's underlying conviction in *People v. Coleman* (May 24, 2012, B223207) (nonpub. opn.).

L. Smith was dead from multiple gunshot wounds. D. Smith and Rankins both identified defendant in a photographic lineup, and later identified defendant in court as the shooter. D. Smith also noticed that the shooter had a tattoo on his arm. Defendant had a dollar sign tattoo on his arm. D. Smith was shown a photograph of Derron Jones (Jones), who she did not recognize, but knew he was not the shooter.

Firearms expert William Moore testified the bullet casings recovered by the police at the scene suggested two weapons had been fired that day, the M-11 rifle and a .40-caliber pistol.

### Gang evidence

The shooting occurred in the territory claimed by the East Coast Crip gang (East Coast). Defendant was an active member of the Grape Street Crip gang (Grape Street). Several Los Angeles Police Department officers testified that defendant had admitted his membership in the gang to them. In 2005, defendant admitted to Officer Oscar Villarreal that he was a member of Grape Street and was known by the moniker "Goobie." In 2006, while in the company of Kejuan Bullard, the brother of the Grape Street leader Brandon Bullard (Bullard), defendant admitted his membership in Grape Street to Officer Daniel Pearce. In 2007, defendant admitted his gang membership to Officer Rafael Lomeli, and in 2008, admitted his gang membership to Officer Anthony Ares. When Deputy Sheriff Robin Russell arrested defendant after stopping the blue Jeep Cherokee in which he was riding, defendant admitted he was a member of Grape Street to the deputy. Finally, Officer Ivan McMillan testified defendant admitted being an active member of the gang to him.

Approximately eight months before the subject shooting, Bullard, a prominent member of Grape Street, a leader of a subset at one time, and greatly respected within the gang as well as by rival gangs, was shot to death. The investigating officer, Detective Meghan Aguilar, testified she identified an East Coast member as the suspected killer, but no charges had been filed.

Officer Samuel Marullo testified as a gang expert with experience investigating both East Coast and Grape Street. Officer Marullo knew Bullard for at least five years before his death, and had spoken to the officers who investigated Bullard's murder, including Detective Aguilar[3]. In Officer Marullo's expert opinion Bullard's murder precipitated a feud between former allies East Coast and Grape Street. Since then, East Coast members had been convicted of shooting two Grape Street members, killing one. The feud was ongoing at the time of the subject shooting which Officer Marullo explained was because Bullard was a beloved leader of Grape Street and it would thus be disrespectful to settle the feud quickly.

Officer Justin Chi testified that on October 3, 2008, when he and his partner were patrolling in the Jordan Downs housing development, territory claimed by Grape Street, he saw Ricky Hanzy (Hanzy) on the sidewalk with a rifle in his hands. Hanzy ran, and when the officers pursued him, he threw the rifle under a parked car. Hanzy was later identified as a member of Grape Street, and the rifle as the same M-11 rifle used by defendant in this case.

---

[3]     It was from these conversations Marullo learned the suspect in the Bullard murder was Steven Hammond, a known member of East Coast.

4

The prosecution's other gang expert, Officer McMillan, testified Grape Street is a criminal street gang with several subsets, that uses a common symbol and color, and has approximately 2,400 to 3,000 members. The primary activities of Grape Street are murder, attempted murder, drive-by shootings, robbery, assault with deadly weapons, illegal possession of firearms, narcotic sales and transfers, and burglary. Officer McMillan testified that a member who committed crimes for the gang would enhance both the gang's financial status and the member's own status within the gang. Gang members earned the respect and recognition of leaders, which increased their chances of being elevated within the gang, by committing crimes that instilled fear in the community. Officer McMillan explained that respect was "very, very, very important, probably the most important aspect of being a gang member." Respect was particularly important for the Grape Street gang who, he testified, was in an ongoing war with East Coast.

Given a hypothetical question that tracked the facts of the West 70th Street shooting, Officer McMillan opined that the shooting was committed for the benefit of Grape Street, as it was clearly a retaliatory shooting for Bullard's murder. Shooting at people in an East Coast stronghold such as West 70th Street benefitted Grape Street by promoting the gang and instilling fear in the area. It did not matter whether the victims were gang members because the residents in that area would know that it was a retaliatory shooting. When committing such a crime, gang members might call out the name of their gang, but did so less nowadays, to avoid providing evidence to the police.

Officer McMillan testified it was not unusual for gang members to ride in several cars to attend a shooting. Often the

group includes a "shot-caller," crew chief, or captain, to verify that the particular soldier or young member committed the crime. Officer McMillan also testified that larger gangs kept what was known as a "hood gun" to pass from member to member as needed to commit a crime, because firearms were currently more difficult to obtain.

### Defense evidence

Douglas Compton (Compton), a member of East Coast who had been convicted of two felonies as well as having been charged with domestic violence against D. Smith, testified he was present at the time of the shooting. He added that he saw the shooter and it was not defendant. He claimed the shooter was a light-skinned, mixed-race African-American with long braided hair, whereas defendant was dark-complected and not of mixed race. The shooter was slim, six feet one inch tall or shorter, and wore a white T-shirt.[4]

Compton acknowledged a "snitch" was someone who reported a crime or testified against someone charged with a crime, which no East Coast member was permitted to do, regardless of the defendant. The East Coast "code of silence" extended to all gang members. Compton knew that snitches were beaten or stabbed in custody.

Defendant's mother, Tracy Coleman (Coleman), admitted having a prior conviction for grand theft and testified that on August 25, 2008, she dropped defendant off between 11:30 a.m. and 12:00 p.m. at her nephew's birthday party at the home of defendant's girlfriend, Winesha Pitts (Pitts). She also saw

---

[4] Defendant testified he was 5 feet 11 inches tall, and that on August 25, 2008, he weighed 190 to 195 pounds.

6

defendant there on the front porch as she drove by around 5:00 or 5:15 p.m. She waved and blew her horn as she passed by and did not see defendant again until 9:45 p.m. Coleman acknowledged defendant was a member of Grape Street, as was her other son Treynel. She testified they lived in Jordan Downs, which was Grape Street territory, and that Bullard was defendant's second cousin.

Pitts, defendant's girlfriend and mother of his child, testified that defendant attended the birthday party she gave for defendant's cousin on August 25, 2008. Defendant arrived sometime between 11:00 a.m. and 12:00 p.m., and left around 10:00 p.m. Pitts did not see defendant leave for a significant period of time that day, but did not watch him during the entire day. Pitts saw defendant's mother drive by her residence around 2:00 or 3:00 p.m., and saw defendant's mother pick up defendant that evening at approximately 10:00 or 11:00 p.m. Pitts denied defendant was a gang member.

Defendant's cousin, Michael Hawkins (Hawkins) testified he arrived for his birthday party at 5:00 or 5:30 p.m. and left at 10:00 p.m. He and defendant left the party around 8:00 p.m. to get marijuana, but were gone for only 5 to 10 minutes. Hawkins was with defendant on the front porch when Coleman passed by and waved. Hawkins testified defendant was affiliated with Grape Street as were most of the younger residents of Jordan Downs. The majority of those who were not members were affiliated with Grape Street as otherwise it was a dangerous place to live. Hawkins also testified, "I don't know if he's affiliated or not." At the preliminary hearing, Hawkins testified that defendant was not a member of Grape Street.

Shavona Miller (Miller), who lived next door to Pitts and knew defendant, testified she saw defendant at the birthday party on Pitts's porch at approximately 5:30 p.m., and saw him leave when his mother picked him up at the end of the evening. She also saw defendant's mother pass by, and although Miller was not sure of the time, defendant's mother's usual time to pass by on her way to play bingo was 5:20 or 5:30 p.m.

D. Smith was called as a defense witness and questioned about inconsistent statements she gave the police regarding her estimate of the shooter's height and weight and the presence of Douglas Taylor at the scene of the shooting. D. Smith did not remember what estimate she gave and denied telling the police she had been with Taylor that day.

Defendant testified he had lived in Jordan Downs since 1999, with his parents, siblings and uncle Charles, who recently died. Defendant denied he was a member of Grape Street, the only gang in the neighborhood, although it was advisable for anyone growing up in Jordan Downs to be a member of the gang. He admitted being affiliated with Grape Street, however, and that its members considered him a friend.

Defendant claimed he was not at the scene of the shooting on August 25, 2008. He arrived at the party around 11:00 a.m. or 12:00 p.m., and did not leave, other than a short walk of two or three blocks to the store to buy marijuana, until his mother picked him up at 9:00 or 10:00 p.m. Defendant claimed the trip to the store took no more than a few minutes.

Defendant acknowledged he asked for a lineup but refused to participate when he saw the other people chosen for the lineup. He refused because they looked nothing like him and he was

promised they would put together another lineup. A senior officer later refused a second lineup.

Defendant denied telling police he was a member of the Grape Street gang, but admitted he was associated with its members, knowing they committed violent crimes such as murder, attempted murder, and robbery. Defendant admitted being in the blue Jeep on the day of his arrest, but claimed he just happened to get a ride that day and had never previously seen the car. He also testified he was walking by himself toward a restaurant, when he was approached by three men in the Jeep. Defendant identified the Jeep in a photograph previously identified by witnesses in the trial. It was driven by Jones, whom defendant claimed never to have met before that day. Defendant's longtime friend Terrell, a Grape Street member whose last name he did not know, was one of the two passengers. Terrell offered defendant a ride, and Jones drove to the restaurant. Defendant testified they parked, Terrell went into the restaurant, and as they waited, defendant prepared marijuana for smoking. After being in the parking lot a few minutes, the police came and he was arrested.

Defendant admitted that he sustained a felony conviction for possession of a firearm by a felon in 2007.

**Procedural background**

In 2010, a jury convicted defendant of one count of first degree murder (§ 187, subd. (a); count 1); three counts of attempted willful, deliberate, and premeditated murder (§§ 187, subd. (a)/664; counts 2-4); shooting at an inhabited dwelling (§ 246; count 5); and possession of a firearm by a felon (§ 12021, subd. (a)(1); count 6). As to counts 1 through 4, the jury found true firearm allegations within the meaning of section 12022.53,

9

subdivisions (b), (c), (d), (e), and (e)(1). Additionally, as to counts 1 through 5, the jury found true the gang allegations pursuant to section 186.22, subdivision (b)(1)(C).

The trial court sentenced defendant to an aggregate term of 170 years to life in prison. The judgment was affirmed in *People v. Coleman, supra,* B223207. A petition for review by the California Supreme Court was denied on August 29, 2012. (*People v. Coleman* (Aug. 29, 2012, S203786).)

On August 1, 2023, defendant filed a petition to vacate his murder conviction and for resentencing under section 1172.6, which provides a procedure for persons convicted of murder, manslaughter or attempted murder to obtain retroactive relief if they could not be convicted under sections 188 and 189 as amended effective January 1, 2019. (*Delgadillo, supra,* at p. 223, fn. 3.) A petition for such relief may be filed by those who were not the actual killer, did not act with the intent to kill, or were not a major participant in the underlying felony who acted with reckless indifference to human life. (Stats. 2018, ch. 1015, § 1(f).)

The People filed a response in opposition to defendant's petition arguing defendant had failed to make a prima facie showing for relief because he was prosecuted as the actual killer and his jury had not been instructed on felony murder or natural and probable consequences.

On February 27, 2024, the trial court held a hearing to decide whether defendant had established a prima facie case for relief. The court denied defendant's petition upon finding the record of conviction conclusively showed defendant was prosecuted as the actual killer, the jury found true the personal use of a firearm allegation, "there was no one else charged" in the

offense and, therefore, he had not made a prima facie showing of eligibility. Defendant did not appeal denial of the petition.

On November 25, 2024, defendant filed a second petition to vacate his murder conviction and for resentencing pursuant to section 1172.6. On December 3, 2024, the court found the petition was "virtually identical" to his first section 1172.6 petition, which had been denied; the court summarily denied the petition as "duplicative."

Defendant filed a timely notice of appeal from the order of denial.

## DISCUSSION

Where, as here, appointed counsel finds no arguable issues in an appeal that is not from the first appeal after conviction, we are not required to conduct an independent review of the record. (See *Delgadillo, supra*, 14 Cal.5th at p. 226.) However, even if we do not independently review the record to identify unraised issues in a case, we give the defendant the opportunity to file his or her own supplemental brief or letter and we then evaluate any specific arguments raised. (See *id*. at p. 232.)

Counsel provided defendant with a copy of the record on appeal and informed him of his right to file his own supplemental brief. We notified defendant of counsel's brief and gave defendant 30 days to file his own letter or brief stating any grounds for an appeal, contentions, or arguments he wished to be considered, and if he did not the appeal would be dismissed. Defendant filed a supplemental brief within the time allowed.

As best as we can discern, defendant's supplemental brief contends he is actually innocent. Attached to his supplement is a notarized letter from a trial witness contending, in essence, she

11

did not actually see the shooter, and she identified defendant in a police lineup because one of the shooting victims told her who to choose. Defendant contends his counsel failed to introduce the evidence to establish he was wrongfully convicted.

Defendant's claim of actual innocence is not properly before this court in an appeal from the denial of defendant's section 1172.6 petition. Section 1172.6 is a mechanism to provide relief for murder, attempted murder, or manslaughter convictions that may have been based on now-invalid theories. (*Delgadillo, supra,* at p. 223; *People v. Lewis* (2021) 11 Cal.5th 952, 959–960.) Defendant was convicted by a jury as the actual shooter and the jury found true he personally used a firearm in the commission of the offenses. Additionally, defendant's jury was not instructed regarding felony murder or natural and probable consequences. Thus, he is not eligible for relief pursuant to section 1172.6.

## DISPOSITION

The order of December 3, 2024, denying the defendant's section 1172.6 petition is affirmed.

CHAVEZ, Acting P. J.     RICHARDSON, J.     SIGGINS, J.*

\*      Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.